UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
------------------------------------------------------------X
Samuel Rumala,

                                 Plaintiff,                              02 CV 3828 (SLT) (KAM)

          -against-                                                     <u>MEMORANDUM</u>
                                                                        <u>& ORDER</u>

New York City Transit Authority and
Thomas Calandrella,

                                 Defendants.
------------------------------------------------------------X
TOWNES, District Judge:

          Plaintiff Samuel Rumala ("Plaintiff"), a black Nigerian male, brings this employment

discrimination action under 28 U.S.C. §§ 1981, 1983, New York Executive law § 290 et. seq.

("NYHRL"), New York City Administrative Code § 8-107 ( "NYCHRL"), against his employer,

defendant New York City Transit Authority ("NYCTA"), and a former NYCTA employee,

Thomas Calandrella ("Calandrella") (collectively the "Defendants").  For reasons discussed

herein, Defendants' motion for summary judgment is granted and Plaintiff's complaint is

dismissed.

<u>STATEMENT OF FACTS</u>

          In 1983, Plaintiff began his employment at NYCTA as a staff analyst in the Department

of Budget and Planning.  (Def. 56.1 Stat. ¶ 1.)  Two years later, he was promoted to provisional

associate staff analyst in the Department of Track and Structures.  (Def. 56.1 Stat. ¶ 2; Pl. 56.1

Stat. ¶ 2.)  In 1986, he was promoted to provisional Principal Transit Management Analyst in the

Department of Track.  (Def. 56.1 Stat. ¶ 5; Pl. 56.1 Stat. ¶ 5.)  In November 1998, Plaintiff was

promoted to provisional Manager of Track Applications in the Department of Track and

1

Structures.  (Def. 56.1 Stat. ¶ 6; Pl. 56.1 Stat. ¶ 6.)  Four years later, Plaintiff's title became

provisional Director of System Rail Maintenance.  (Def. 56.1 Stat. ¶ 9; Pl. 56.1 Stat. ¶ 9.)

Defendant Calandrella worked his way up in the NYCTA to become Chief Track Officer,

the highest ranking official in the Department of Track,[1] in 1995.  (Def. 56.1 Stat. ¶ 7; Pl. 56.1

Stat. ¶ 7.)  In this position, he was responsible for 2100 employees.  (Agostisi Dec., Ex. B at 21.)

His duties included hiring Assistant Track Officers and other managers.  (Agostisi Dec., Ex. B at

111.)

*Job Applications Submitted by Plaintiff*[2]

From 1999 to 2002, Plaintiff applied for and was denied fourteen promotions by the

NYCTA.  For the majority of these jobs, he claims that he was more qualified than the successful

applicants because, *inter alia*, he holds a bachelor's degree in computer science, a master's

degree in industrial engineering, and a doctoral degree in electrical project management.  (*See*

Ellman Dec., Ex. 7.)  Each position will be discussed in turn.

In 1999, the NYCTA created a new department called Technology and Information

Services ("TIS").  (Def. 56.1 Stat. ¶ 10.)  Gerald Provenzano was the Senor Vice President of

this new department and responsible for its creation.  *Id.*  He was also responsible for the

selection of people to fill the new positions in TIS who reported directly to him.  (Def. 56.1 Stat.

¶ 12.)  These positions included: Chief Telecommunications Officer; Chief Officer-Strategic

---

[1] The organizational structure of the NYCTA places the Department of Track within the Maintenance of Way Division, a division within the Department of Subways.  (*See* Agostisi Dec., Ex. C at 27-28.)  The NYCTA president oversees the head of the Department of Subways, whose title is Senior Vice President.  (*See* Agostisi Dec., Ex. C at 17-18.)  This person oversees the head of the Maintenance of Way Division, who oversees the head of the departments within that division.  *Id.*  Thus, as Chief Track Officer, Calandrella was two levels below the NYCTA president in the authority's hierarchy.

[2] See Appendix A for a chart of the positions for which Plaintiff applied.

Planning, Integration and Engineering; Chief Officer-New Technology Implementation; Chief Financial Officer; and Chief Information Officer.  *Id.*  The NYCTA posted vacancy notices for these positions in August 1999.  *Id.*

Plaintiff applied for all five TIS positions on or about September 1999.  (Def. 56.1 Stat. ¶ 13.)  After review by Human Resources, it was determined that Plaintiff was minimally qualified to interview for three positions: Chief, New Technology Implementation; Chief Financial Officer; and Chief Information Officer.  (Def. 56.1 Stat. ¶¶ 14, 15.)  Plaintiff was not selected for any of the TIS positions, and claims that the candidates who were selected were not chosen on their individual merits.  (*See* Def. 56.1 Stat. ¶ 16-24; Pl. Stat. 56.1 ¶ 16.)  Defendants claim that the selection of the candidates was based on the resumes, letters of application, experience, skills and interviews of the candidates.  (Def. 56.1 Stat. ¶ 16.)

In 2000, Plaintiff applied but was not selected to interview for two new positions, Senior Director of Operations Support Information Management and Senior Director of Sales Business, in the newly-created Information Management Unit in the Department of MetroCard Operations.  (Def. 56.1 Stat. ¶¶ 25, 26, 28.)  This unit was created "to support the growing information needs of MetroCard Operations as the MetroCard vending machines were being installed throughout the Transit system," and therefore, Defendants claim, a high level of management knowledge and experience was required for these positions.  (Def. 56.1 Stat. ¶ 28.)  Steven Ernst, then Chief Officer, MetroCard Information Management, selected the successful applicants.  (Def. 56.1 Stat. ¶ 25.)

Defendants claim that Plaintiff was not selected to interview for these positions because "his resume did not demonstrate that he was a full-time systems professional, i.e., someone

whose job is to develop relational database systems, work with users and consultants to ensure the systems meets the needs of the department." (Pl. 56.1 Stat. ¶ 26.) Further, they state that his resume did not indicate that he "had experience with (and knowledge of) MetroCard Operations," or "clearly illustrate what his job duties were as they related to Information Systems." (Def. 56.1 Stat. ¶ 26.) Plaintiff claims that he has this experience because he "envisioned and created the database system used by Department of Track." (Pl. 56.1 Stat. ¶ 26.) He also disputes whether his lack of experience in "MetroCard Operations factored into NYCTA's decision" not to interview him for these positions, "insofar as neither of the successful job applicants listed significant MetroCard experience in their respective resumes." *Id.* Moreover, Plaintiff claims that he was more qualified than both of these individuals because he has vast experience with information management. (Pl. 56.1 Stat. ¶ 28.)

Also in 2000, an audit of the NYCTA's inspection and maintenance practices for track and switches was completed to determine if inspections were performed as required, and defects were documented completely and accurately. (Def. 56.1 Stat. ¶ 46.) Defendants state that "the results of the audit indicated that 'better administrative controls and technical support is [*sic*] needed in order to effectively manage identified deficiencies and to schedule track maintenance." *Id.* The audit also suggested that "'quality assurance inspectors, independent of the subdivision, should verify inspections and determine if the information in the database is complete and accurate [and] all defects...should be incorporated into one linked database to help Superintendents effectively schedule maintenance forces.'" *Id.* Plaintiff asserts that this suggestion was essentially to develop a new analytical framework, through the implementation of a new computer system. (Pl. 56.1 Stat. ¶ 46.)

Defendants claim that as a result of this audit, the Department of Track was reorganized in 2002, creating a new group in the Department called Track/Construction Maintenance, also known as the Track Planning Group.  (Def. 56.1 Stat. ¶ 47.)  This group's structure included a General Superintendent who was responsible for implementing a new computer system and supervising four to five maintenance supervisors, who were to complete track inspections, and analysts, who were to compile and analyze the data.  *Id.*  On or about December 14, 2001, the NYCTA posted a job vacancy notice for this new position of General Superintendent.  (Def. 56.1 Stat. ¶ 48.)  Plaintiff applied in January 2002, and was not selected to interview for this position because the NYCTA states that he had not performed track work in track construction or track maintenance, and therefore lacked operating experience.  *Id.*

Calandrella selected Terri Rumph ("Rumph"), a black female, for the position of General Superintendent.  (Def. 56.1 Stat. ¶ 49.)[3]  She completed the NYCTA's Superintendent Intern Program where college graduates rotate through different positions in the Track Department, including track worker, night supervisor, and superintendent, and different subdivisions, including Signals, Infrastructure, Third Rail, and Rapid Transit Operations over a thirty-nine-month period.  (Def. 56.1 Stat. ¶ 50.)  From 1997 through 2002, Rumph held the title of Superintendent, Track Construction Department.  (Def. 56.1 Stat. ¶ 51.)  Defendants state that through her eight years of experience in the Maintenance of Way Division, five of which were in a managerial and supervisory capacity, she had experience in different areas, such as project management, maintenance management techniques, and labor relations.  *Id.*

---

[3] Calandrella identifies Rumph as black in his deposition.  With respect to her ethnicity, he thought she was born in the United States because he worked with her father.  (*See* Agostisi Dec., Ex. B at 67-68.)

Plaintiff gives a very different account of the audit and the resulting change in his department. He claims that this department reorganization cannot be characterized as such because only one new person, Rumph, was hired, she was hired for the General Superintendent position, no positions were eliminated from the unit, and only his duties changed as a result of the reorganization. (Pl. 56.1 Stat. ¶ 47.) He claims that the changes were in fact retaliation against him for his formal complaint of discrimination, which was filed less than a month prior to the issuance of the job vacancy notice. *Id.* Plaintiff also asserts that Rumph's position could not have been the result of the audit because she reported to the head of the division, Calandrella, and the audit recommended that the new quality assurance inspectors be independent of the subdivision. He also claims that the people who were under Rumph's supervision formerly reported to him. *Id.*

With respect to his application for the General Superintendent position, Plaintiff claims that the NYCTA's stated reason for not selecting him to interview, i.e. that he lacked operational experience was pretextual, in that it was either fabricated or disregarded. (Pl. 56.1 Stat. ¶ 48.) He supports this claim by stating that Joseph Caizzo, one of the Assistant Chiefs of Track was hired for that position despite the fact that he had no operational experience. *Id.* He points out that his current supervisor, Michael Iovino, also has no operational experience. *Id.* Moreover, he claims that operational experience is not needed to detect track defects in the field and/or to monitor repairs and maintenance. *Id.* He also claims that Calandrella sought to exclude him from weekly "red-tag" meetings, which were attended by high-level officials in the Department of Track and for which he would compile a report, and that the reorganization gave him the opportunity to do so. (*See id.*; Rumala Aff. ¶ 16.) Plaintiff also claims that the fact that the

length Rumph's experience fit the requirements of the job vacancy notice exactly was an attempt to preclude Plaintiff from being selected. (Pl. 56.1 Stat. ¶ 51.)

After Rumph was selected for the General Superintendent position, she also became Plaintiff's supervisor. (Def. 56.1 Stat. ¶ 52.) Plaintiff's position was eliminated from the budget as a part of the reorganization. *Id.* Nevertheless, he retained his title, salary, and duties, and became part of the new Track Planning Group. *Id.*

In November 2000, Plaintiff applied for the position of Senior Director, Traffic Checking Operations. (Def. 56.1 Stat. ¶ 31; Pl. 56.1 Stat. ¶ 31.) Defendants state that Plaintiff was not selected to interview for this position because "he had only supervised a small number, five to eight, of professional and technical employees," and therefore lacked sufficient managerial experience. (Def. 56.1 Stat. ¶ 33.) Plaintiff disputes Defendants' claim that having operations experience in a large field unit was a requirement for the successful job applicant because it is not listed on the job vacancy notice for this position, and questions whether or not all applicants selected for interviews had this experience at the time they applied for the position. (Pl. 56.1 Stat. ¶ 33.) Additionally, he claims that the reason he lacked supervisory experience over a large group of people at the time of his application was due to NYCTA's unlawful discrimination in addition to, or alternatively, retaliation against him. *Id.*

In March 2002, the NYCTA posted three job vacancies in the Department of New Technology Implementation/TIS. (Def. 56.1 Stat. ¶¶ 40, 42, 44; Pl. 56.1 Stat. ¶ 40, 42, 44.) These positions were: Director, Operations Coordination; Senior Director, Project Planning; and Senior Project Director. *Id.* Again, Plaintiff applied and but not interviewed for these positions. *Id.* For the position of Director, Operations Coordination, Anthony Carestia, Senior Director,

New Technology Implementation, selected William Shrange ("Shrange"), a white male. (Def. 56.1 Stat. ¶ 41.) Shrange had been Deputy Superintendent in Rapid Transit Operations. *Id.* Defendants claims that Plaintiff was not selected to interview for the position because he did not have a background in Rapid Transit Operations. (Def. 56.1 Stat. ¶ 40.) Plaintiff disputes that this background was a prerequisite for this position and that this type of experience was "listed as one of a number of 'desirable skills.'" (Pl. 56.1 Stat. ¶ 40.) He also claims that five years prior to his appointment, Shrange owned and operated a pet store in Connecticut. *Id.* In addition, he reasserts his argument that his lack of managerial experience was due to a pattern and practice of discrimination and retaliation by the NYCTA, and that his educational background surpassed that of the selected candidate. *Id.*

Defendants claim that the candidates selected to interview for the position of Senior Director, Project Planning, "demonstrated knowledge of Intelligent Transportation Systems, necessary experience in managing multiple projects and supervising both managers and professional and technical personnel, or Rapid Transit operations experience." (Def. 56.1 Stat. ¶ 43.) Blakely, Chief Officer, New Technology Implementation, selected David Weiss ("Weiss"), a white male, who held title of Senior Director, Control Center Modernization in the Department of New Technology Implementation for ten years. *Id.* His previous experience included responsibility for the scope, schedule, and budget for the Automatic Train supervision, Rail Control Center and the Subway Traffic and Train Information System. *Id.*

The NYCTA claims that it interviewed candidates whose resumes demonstrated "experience in managing various projects...interconnected with other departments, familiarity with new transportation technology, or Rapid Transit Operations knowledge" for the position of

Senior Project Director. (Def. 56.1 Stat. ¶ 45.) To fill this position, Blakely chose James Bailey ("Bailey"), a black male,[4] who held the title of Director, New Technology Implementation, Subway System Technology at the time of his application and had eight years of experience in the Department. *Id.* Plaintiff asserts that he had eleven years of seniority over Bailey, and that a pattern and practice of discrimination by the NYCTA prevented him from gaining the managerial experience. *Id.*

In March 2002, Plaintiff applied for the position of Senior Director, Operations System Software. (Def. 56.1 Stat. ¶ 37; Pl. 56.1 Stat. ¶ 37.) Although Plaintiff interviewed for the position, Defendant claims that McDermott did not select him because he lacked experience managing a large staff. Further, his background included no experience with authority-wide computer systems, and in the new technology of Intelligent Transportation Systems. (Def. 56.1 Stat. ¶¶ 38, 39.) The successful applicant, Isaac Takyi ("Takyi"), a black male,[5] was considered better qualified because he had this experience. *Id.* At the time of Takyi's selection, he held the title of Director, Intermodel Systems Software/Customer Systems Technology/Intelligent Transportation Systems. *Id.* In this position, Takyi was responsible for initiating new information systems and user requirements, managing and reviewing the information systems work of consultants, providing software development lifecycle support, program management and coordination of bus service and maintenance technology applications, and managing professional and technical staff. *Id.* Takyi previously held the position of Director, Facilities and Equipment Planning/Intelligent Transportation Systems, where his responsibilities included

---

[4] The record does not reveal Bailey's ethnicity.

[5] The record does not reveal Takyi's ethnicity.

developing operational plans for technology systems and service improvement programs and acting as the NYCTA's representative to committees and groups associated with Intelligent Transport Systems, and developed capital project proposals with various departments in the NYCTA. *Id.* Takyi also published articles and presented at workshops and conferences dealing with the new technology of Intelligent Transport Systems. *Id.*

Plaintiff contends that he was more qualified than Takyi. He points to the fact that he had seniority over and more tenure than Takyi. (Pl. 56.1 Stat. ¶ 39.) He also asserts that experience with authority-wide computer systems, Intelligent Transport Systems, and managerial experience over "supervisors and managers" were not prerequisites for the position of Senior Director, Operation System Software. *Id.* He further asserts that his dissertation entitled "Automated Condition Interpretation Strategy for Track Geometries" was a study of a field "akin to" Intelligent Transport Systems. *Id.* In addition, he reasserts his argument that his lack of managerial experience was due to a pattern and practice of discrimination and retaliation by the NYCTA, and that his educational background surpassed that of the selected candidate. *Id.*

On or about May 13, 2002, Plaintiff applied for the position of Director, Maintenance Software Support. (Def. 56.1 Stat. ¶ 35; Pl. 56.1 Stat. ¶ 35.) Plaintiff was not selected to interview for this position that was designed to support an authority-wide computer system, i.e. one utilized throughout the NYCTA, in the Department of Buses. *Id.* Defendants claim that Plaintiff lacked managerial experience and experience in application production support, application software procurement, and an authority-wide information technology system. (Def. 56. 1 Stat. ¶ 35.)

On or about June 6, 2002, Joseph Kocovic ("Kocovic"), a white male, was selected for

the position of Director, Maintenance Software Support.  (Def. 56.1 Stat. ¶ 36.)  Kocovic held

the position of Chief Officer, Central Electronic Shop, at the time of his selection.  *Id.*  In this

position, he had experience as an information technology manager with the Department of Buses

as a client, which was the same department that the position of Director, Maintenance Software

Support, was slated to support.  He also supervised 75 employees in this position.  *Id.*  Prior to

holding the title of Chief Officer, Central Electronic Shop, Kocovic held positions throughout

the NYCTA, in which he supervised 64 employees (as General Superintendent of Operations,

Central Electronic Shop, TIS), and a staff of 12 supervisors and 80 field technicians (as Director,

AFC Equipment Maintenance Command Center).  *Id.*

*Racially Motivated Incidents*

Plaintiff alleges that NYCTA officials, including Calandrella, made racially motivated

comments to him or in reference to him on multiple occasions.  The first incident allegedly

occurred in 1985 when Plaintiff was introduced to Calandrella.  (Def. 56.1 Stat. ¶ 53; Pl. 56.1

Stat. ¶¶ 2, 53.)  Plaintiff alleges that upon seeing his face, Calandrella said that "he did not want

him" and sent him to another office, where he performed the duties of his title, Associate

Analyst, and his salary did not change.  *Id.*  In 1989, Plaintiff alleges that his supervisor, Smith,

asked him "a series of questions with regards to the scars" on his face, and about his accent.

(Def. 56.1 Stat. ¶ 54; Pl. 56.1 Stat. ¶ 54.)  Plaintiff responded to these questions, but claims that

Smith asked them in a rude and offensive manner.  *Id.*  Another incident occurred in June 1994,

when Calandrella allegedly said to another employee, Pankaj Shah ("Shah"), that he did not want

to see Plaintiff, "he hated him," and he would tell Herb Klaus "to stop him from coming to

meetings."  (Def. 56.1 Stat. ¶ 55; Pl. 56.1 Stat. ¶ 55.)   Shah in turn told Plaintiff what

Calandrella said.  *Id.*  The last incident occurred at "red-tag meetings" in 2000 or 2001.  (Def. 56.1 Stat. ¶ 56; Pl. 56.1 Stat. ¶ 56.)   According to Plaintiff, Benjamin Everson ("Everson")[6] heard Calandrella remark at a red tag meeting in 2000, that "we can do what we want, that is why we have attorneys at 130 Livingston."  (Pl. 56.1 Stat. ¶ 56.)

*Plaintiff's Performance Reviews and Status Within the NYCTA*

Plaintiff wrote to Brian Semler, Acting Vice President of Human Resources Field Services, with respect to his title and the hay points, e.g. the NYCTA's designation of responsibility associated with certain positions, assigned to it on March 23, 2000.  (Def. 56.1 Stat. ¶ 58; Pl. 56.1 Stat. ¶ 58; *see also* Agostisi Dec., Ex. L at 7.)  After the Office of Human Resources researched the matter, Mr. Semler informed Plaintiff that NYCTA records reflected that his grade-level and hay points had been downgraded, then retroactively adjusted although there was no change in Plaintiff's salary.  *Id.*  Plaintiff asserts that this "false downgrade" detrimentally affected his ability to obtain a promotion and salary increases "because it is 'unusual' for employees to be able to skip, or 'jump' grade levels to receive a particular promotion."  (Pl.56.1 Stat. ¶ 59.)

There is also some dispute over Plaintiff's performance in both 2000 and 2001.  In April 2001, although Plaintiff's overall rating was "good," he received marginal ratings on his annual performance review for 2000.  (Def. 56.1 Stat. ¶ 62; Ellman Dec., Ex. 35.)  He signed this evaluation in protest, indicating he would appeal it.  (Ellman Dec., Ex. 35.)  In February 2001, Plaintiff was reprimanded for submitting a memorandum to his supervisors, Thomas and

---

[6] Benjamin Everson also filed an employment discrimination suit against Defendants in 2002.  *See Everson v. New York City Transit Auth.*, 216 F. Supp.2d 71 (E.D.N.Y. 2002) (Glasser, J) (granting defendants' motion to dismiss plaintiff's conspiracy claim, claim for punitive damages, and those claims barred by the statute of limitations).

DellaMonica, with incomplete or missing information. (Def. 56.1 Stat. ¶¶ 60, 61.) In February 2002, Plaintiff received another overall "good" rating on his annual performance evaluation, but this evaluation also included some "marginal" ratings. (Def. 56.1 Stat. ¶ 63; Ellman Dec., Ex. 36.) Plaintiff also signed this evaluation in protest, claiming that it was "inaccurate, discriminatory, and retaliatory," and indicating that he attached an appeal to the document. (Ellman Dec., Ex. 36.) Plaintiff claims that Calandrella alone wrote this evaluation contravening NYCTA policies, customs, and/or practice, and in retaliation for the filing his EEO Complaint. (Pl. 56.1 Stat. ¶ 62.) Plaintiff also disputes the "marginal" ratings with respect to budgeting included in the 2001 complaint, claiming that another employee provided budget information to Calandrella on a monthly basis. *Id.*

## PROCEDURAL HISTORY

Plaintiff began to seek a remedy for his situation in 2000. Plaintiff's counsel sent a letter to the NYCTA on February 14, 2000. (Def. 56.1 Stat. ¶ 57; Pl. 56.1 Stat. ¶ 57.) Two months later, on April 10, 2000, Plaintiff met with NYCTA representatives. *Id.* Plaintiff claims that since this time he "has become a marked man and his work more scrutinized." (Pl. 56.1 Stat. ¶ 57.) Plaintiff wrote a memorandum addressed to the Director of the Metropolitan Transit Authority Office of Civil Rights, which is dated and stamped "received" on October 30, 2001, discussing his complaints. (Ellman Reply Dec., Ex. 41.) On November 16, 2001, Plaintiff then filed a complaint ("EEO Complaint") with the Office of Civil Rights. *Id.*[7] After an investigation, the Office of Civil Rights found "no reasonable cause to believe that plaintiff was

---

[7] It is unclear what occurred between the receipt of Plaintiff's memorandum and the date of the EEO complaint.

discriminated against on the basis of race, color, national origin and/or unlawful retaliation." (Def. 56.1 Stat. ¶ 58; Pl. 56.1 Stat. ¶ 58.)  On July 2, 2002. Plaintiff filed suit in this Court.  After filing their moving papers on this motion for summary judgment, the parties appeared for oral argument on March 4, 2005.

<u>DISCUSSION</u>[8]

Plaintiff seeks relief for alleged employment discrimination under 42 U.S.C. §§ 1981[9] ("Section 1981") and 1983[10] ("Section 1983").  The Second Circuit recently stated that Section 1981 "outlaws discrimination with respect to the enjoyment of benefits, privileges, terms, and conditions of a contractual relationship, such as employment."  *Patterson v. County of Oneida*,

---

[8] Plaintiff also moved to strike portions of the Defendants' Reply declaration, specifically Exhibit 48 and portions of the Reply memorandum of law relating to it, because this exhibit was not produced during discovery. The Court denied this motion at oral argument because although not substantially justified or harmless, Defendants did not act with bad faith and callous disregard for the Federal Rules of Civil Procedure by not producing Exhibit 48, attached to their Reply Declaration.  *See Palma v. Pharmedica Communications, Inc.*, 2002 U.S. Dist. LEXIS 26159, at *7 (D.Conn. Mar. 27, 2002) (citing *McNerney v. Archer Daniels Midland Co.*, 164 F.R.D. 584, 587 (W.D.N.Y. 1995)); *Ward* v. Nat'l Geographic Society, 2002 U.S. Dist LEXIS 310, at *8 (S.D.N.Y. Jan. 11, 2002); *Henrietta D. v. Guiliani*, 2001 U.S. Dist LEXIS 21848, at *14-15 (E.D.N.Y. Dec. 11, 2001).

[9] This statute was originally passed as Section 1 of the Civil Rights Act of 1866.  *See Jett v. Dallas Indep. Sch. Dist.*, 491 U.S. 701, 713 (U.S. 1989).  It states:

> All persons within the jurisdiction of the United States shall have the same right in every State and Territory to make and enforce contracts, to sue, be parties, give evidence, and to the full and equal benefit of all laws and proceedings for the security of persons and property as is enjoyed by white citizens...

42 U.S.C. § 1981(a).

[10] Title 42, Section 1983 of the United States Code states:

> Every person who, under color of any statute, ordinance, regulation, custom, or usage, of any State or Territory or the District of Columbia, subjects, or causes to be subjected, any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured in an action at law, suit in equity...

42 U.S.C. § 1983.

375 F.3d 206, 224 (2d Cir. 2004) (citing *Whidbee v. Garzarelli Food Specialities, Inc.*, 223 F.3d 62, 68-69 (2d Cir. 2000)), and Section 1983 furnishes a cause of action against a state actor for the violation of federal rights created by federal statutory rights. *Dean v. New York Transit Auth.*, 297 F. Supp.2d 549, 554 (E.D.N.Y. 2004) (Block, J.) (citing *Annis v. County of Westchester*, 36 F.3d 251, 254 (2d Cir. 1994)).[11]  In fact, a cause of action pursuant to Section 1983 is the "'exclusive federal remedy for violation of the rights guaranteed in § 1981 by state governmental units.'" *Patterson*, 375 F.3d at 225 (quoting *Jett*, 491 U.S. at 733).  Also, Plaintiff's hostile work environment, *see Whidbee*, 223 F.3d at 69, failure to promote, *see Brown v. County of Oneida*, 2000 U.S. Dist. LEXIS 14799, at *37 (N.D.N.Y. Sept. 28, 2000), and retaliation claims, *see Hawkins v. 1115 Legal Service Care*, 163 F.3d 684, 693 (2d Cir. 1998), are actionable under § 1981.  However, "to bring a successful claim under Section 1983, a plaintiff must show in the first instance that: '(1) the defendant acted under color of state law; and (2) as a result of the defendant's actions, the plaintiff suffered a denial of his federal statutory rights, or his constitutional rights or privileges.'" *Mack v. Port Auth.*, 225 F. Supp. 2d 376, 382 (S.D.N.Y. 2002) (quoting *Emblen v. The Port Auth. of New York/ New Jersey*, 2002 U.S. Dist. LEXIS 5537, at *3 (S.D.N.Y. Mar. 29, 2002)).

A.     National Origin Discrimination Claim Under Section 1981

At oral argument, Defendant claimed that Plaintiff's employment discrimination claims should be rejected because they are based only on his national origin.  In his brief, Plaintiff argues that his national origin and race discrimination claims are "indistinguishable" because his

---

[11] Since the NYCTA is a governmental entity or subdivision, it can be sued under Section 1983, *see New York Magazine v. Metropolitan Transit Auth.*, 987 F. Supp. 254, 260 (S.D.N.Y. 1997) (citing *Monell v. Dep't of Social Servs. of the City of New York*, 436 U.S. 658, 690 (1978)).

mistreatment was due to his race, the tribal marks on his face, his foreign accent and the fact that he was born in Nigeria.

"Section 1981 does not prohibit discrimination on the basis of national origin." *Ige v. Command Security Corp.*, 2002 U.S. Dist LEXIS 5612, at *28-29 (E.D.N.Y. 2002) (Glasser, J.) (dismissing the plaintiff's Section 1981 claim to the extent it rests on his Nigerian national origin) (citing *St. Francis College v. Al-Khazraji*, 481 U.S. 604, 613 (1987)). Accordingly, to the extent that Plaintiff's claims are based solely on national origin, they must be dismissed. *See id.*; *Aigbojie v. Federations Employment and Guidance Serv.*, 1997 U.S. Dist. LEXIS 23375, at * 1 (E.D.N.Y. Nov. 7, 1997) (Gershon, J.) (granting defendant's motion to dismiss the plaintiff's Section 1981 employment discrimination claim where the plaintiff claimed he had been discharged because of his Nigerian origin).

Although Plaintiff refers to his national origin in his complaint, he also claims that he has been discriminated against due to the tribal marks on his face and his accented speech. In his brief in opposition to Defendant's motion for summary judgment, he states that his tribal marks are "the most stark and striking symbol of African, and black, identity." (Pl. Mem. at 4.) In *St. Francis College*, the Supreme Court "established that so long as a plaintiff can prove that he was subjected to intentional discrimination based on his race, ethnic characteristics or ancestry, 'rather than solely on the place of his birth or national origin' he has an actionable claim under § 1981." *Adames v. Mitsubishi Bank, Ltd.*, 751 F. Supp. 1548, 1559 (E.D.N.Y. 1990) (Sifton, J.) (quoting *St. Francis College*, 481 U.S. at 613). As a result, "[t]he prohibition against racial discrimination [codified in Section 1981] encompasses discrimination based on ancestry or ethnic characteristics." *Anderson v. Conboy*, 156 F.3d 167, 170 (2d Cir. 1998); *see also*

*Ganthier v. North-Shore Long Island Jewish Health System, Inc.*, 345 F. Supp. 2d 271, 281

(E.D.N.Y. 2004) (Spatt, J.) ("Under Section 1981, 'race' includes ancestry and ethnicity.").  As a

result, his employment discrimination claims can still be brought under § 1981.  *See Sowemimo*

*v. D.A.O.R Security*,  43 F. Supp. 2d 477, 491 (S.D.N.Y. 1999) (considering a Nigerian

plaintiff's § 1981 claim, stating "Sowemimo, as a black woman of African descent, is a member

of a racial minority."); *Ekadem v. District of Colombia*, 1992 U.S. Dist. LEXIS 4822, at *5-6

(D.D.C. Apr. 10, 1992) (denying defendant's motion to dismiss where Nigerian plaintiff alleged

that he had been discriminated against based on national origin and referred to being African and

black in his complaint); *see also Franchetti v. Bloomberg*, 2004 U.S. Dist. LEXIS 21071, at *8-9

(S.D.N.Y. Oct. 20, 2004) (permitting the plaintiff to amend his complaint because he alleged he

was harassed "at least in part because his ethnic origins are French").  Moreover, in their Reply

brief, Defendants state that Plaintiff "bases his claim of racial and ethnicity discrimination on..."

(Def. Reply at 3.)  This statement suggests that it concedes that Plaintiff can bring his § 1981

claims because they are not solely based on his national origin, but also on his race and ethnicity.

Consequently, although Plaintiff's racial discrimination claims are inextricably tied to his

national origin, that fact in and of itself does not bar this Court from hearing his claims.

B.      Liability

Neither Section 1981 nor Section 1983 provide a cause of action on the basis of

*respondeat superior*.  *See Monell*, 436 U.S. 658 (§ 1983); *Jett*, 491 U.S. at 738 (§ 1981).  Thus, a

municipal entity can only be held liable under § 1981 if the plaintiff "can prove that the violation

was committed pursuant to a 'policy, statement, ordinance, regulation, or decision officially

adopted and promulgated by that body's officer.'"  *Bazile v. New York City Housing Authority*,

2002 U.S. Dist. LEXIS 1639, at *51 (quoting *Monell*, 436 U.S. at 690); *see also Zahra v. Town of Southhold*, 48 F.3d 674, 685 (2d Cir. 1995). Similarly, "[a] § 1983 claim against a municipal agency such as the NYCTA is cognizable where the alleged constitutional violation by NYCTA employees resulted from either a government custom, policy, pattern, or practice." *Dean*, 297 F. Supp.2d at 554 (citing *Monell*, 436 U.S. at 690-691). "The policy or custom used to anchor liability need not be contained in an explicitly adopted rule or regulation...So long as the discriminatory practices of city officials are persistent and widespread they could be so permanent and well settled as to constitute a custom or usage with the force of law, and thereby generate municipal liability." *Sorlucco v. New York Police Department*, 971 F.2d 864, 870-71 (2d Cir. 1991) (internal quotation marks omitted). Nevertheless, "[a]n individual official's acts can rise to the level of 'policy' when 'senior personnel' knowingly 'acquiesce' in their subordinates' behavior." *Krulik v. Bd. of Educ. of New York City*, 781 F.2d 15, 23 (2d Cir. 1986) (citing *Turpin v. Mailet*, 619 F.2d 196, 203 (2d Cir. 1980)). Also, where an official who has final authority commits a discrete act, that act can be considered "policy" for the purposes of governmental liability. *Id.*

Defendants argue that the NYCTA should not be held liable on Plaintiff's claims because Plaintiff has failed to demonstrate that the NYCTA had an official policy or custom of discriminating on the basis of race and ethnicity. Plaintiff does not dispute this, but claims that Calandrella was a policymaker such that his allegedly discriminatory actions should be imputed to the NYCTA. With respect to the Defendants' contention, Plaintiff has failed to present any evidence from which a reasonable trier of fact could conclude that the NYCTA had a policy or custom of discriminating against black employees or employees with Plaintiff's ethnic

characteristics with respect to hostile work environments, promotions, or the reorganization of the Department of Track. Accordingly, since Plaintiff has not even alleged a discriminatory policy or custom regarding events with which Calandrella was not involved, summary judgment is granted to the defendant with respect to Plaintiff's failure to promote claim based on his failure to be selected for thirteen positions between 1999 and 2002. *See*, *e.g.*, *Mack*, 225 F. Supp.2d at 384 (S.D.N.Y. 2002) (holding that where the plaintiffs made only vague and conclusory allegations as to whether the defendant municipal agency had a policy or custom of discrimination, the agency was entitled to summary judgment on plaintiff's Section 1981 and 1983 claims as a matter of law).[12]

Regarding Plaintiff's contention, "[a]ctions by an individual with final decision-making authority in a municipality constitute official policy for the purposes of a § 1983 claim." *Anthony v. City of New York*, 339 F.3d 129, 139 (2d Cir. 2003). However, the "mere exercise of discretion" is insufficient to establish municipal liability. *Anthony*, 339 F.3d at 129 (citing *Jeffes v. Barnes*, 208 F.3d 49, 57 (2d Cir. 2000)); *Pembaur*, 475 U.S. at 482-83 ("the fact that a particular official–even a policymaking official–has discretion in the exercise of particular functions does not, without more, give rise to municipal liability based on an exercise of that discretion"). Rather, Plaintiff must prove that the individual "has final authority over significant matters involving the exercise of discretion." *Rookard v. Health & Hospitals Corp.*, 710 F.2d 41, 45 (2d Cir. 1983) (citing *Bowen v. Watkins*, 669 F.2d 979, 989 (5th Cir. 1982)). To prove an

---

[12] Even if Plaintiff could establish that there was a municipal policy of discrimination, he has not raised a genuine issue of material fact as to whether he was denied these promotions on the basis of his race or ethnicity. That is, Plaintiff cannot show that the Defendants' claim that the NYCTA chose the successful candidates because they were more qualified was a "mask for discrimination" because no reasonable jury would find that Plaintiff's qualifications so exceeded those of the successful candidates that discrimination was the motivating factor in denial. *See Byrnie v. Town of Cromwell Bd. of Educ.*, 243 F.3d 93, 103 (2d Cir. 2001).

individual has policy-making authority, the plaintiff must put forth evidence with respect to the individual's "scope of employment and role within the municipal corporate organization." *Id.* "An official's title, though not dispositive of his authority to make policy is relevant for the inferences fairly to be drawn therefrom." *Id.* (internal citation omitted).

Although Calandrella's title was Chief Track Officer and he was in charge of the Department of Track at the time of the reorganization, he stated in his deposition that he and the president "thought [they] needed a new system to track complaints" regarding track maintenance. (Agostisi Dec., Ex. B at 49.) This demonstrates that he was involved, but surely does not establish that he was the policymaking official with regard to the reorganization of the Department of Track. Calandrella also stated in his deposition that he hired Rumph. (Agostisi Dec., Ex. B. at 125.) However, the personnel action report for the hiring of Rumph attached to Defendants' Reply declaration suggests that after Calandrella approved Rumph, she was then approved by five other NYCTA officials. (*See* Ellman Reply Dec., Ex. 39.) Thus, genuine issues of material fact exist with respect to who was the final policymaker with respect to the reorganization of the Department of Track and the hire of at the Rumph. In any case, to hold the NYCTA liable for Calandrella's actions, Plaintiff must prevail on the merits of his claims, which will be addressed *infra*.

Regardless of whether Calandrella's actions can give rise to Monell liability, he may still be liable in his individual capacity under Sections 1981 and 1983. *Thomas v. New York City Health & Hosps. Corp.*, 2004 U.S. Dist. LEXIS 17694 (S.D.N.Y. Sept. 1, 2004). To hold him liable, however, Plaintiff must demonstrate that Calandrella was personally involved in the deprivation of his rights. *Whidbee*, 223 F.3d at 75 (holding that a plaintiff must "demonstrate

'some affirmative link to causally connect the actor with the discriminatory action'" to maintain

an action against an individual under Section 1981) (quoting *Allen v. Denver Pub. Sch. Bd.*, 928

F.2d 978, 983 (10th Cir. 1991));  *Alexander v. City of New York*, 2004 U.S. Dist. LEXIS 17042,

at *47 (S.D.N.Y.Aug. 24, 2004) ("an individual may only be held liable under § 1983 if that

individual is personally involved in the alleged constitutional deprivation") (citing *Beck v.*

*Hastings on Hudson Union Free Sch. Dist.*, 365 F.3d 107, 127 (2d Cir. 2004).  Accordingly,

since Plaintiff alleges that Calandrella was personally involved the incidents forming the basis of

his hostile work environment, failure to promote, and retaliation claims, his claim against

Calandrella may proceed.

> D.    Plaintiff's Substantive Claims[13]

> 1.    *Hostile Work Environment*

"To survive a motion for summary judgment, a plaintiff claiming he or she was the

victim of an unlawful hostile work environment must elicit evidence from which a reasonable

trier of fact could conclude '(1) that the workplace was permeated with discriminatory

intimidation that was sufficiently severe or pervasive to alter the conditions of [his] work

environment, and (2) that a specific basis exists for imputing the conduct that created the hostile

environment to the employer.'"  *Mack v. Otis Elevator Co.*, 326 F.3d 116 (2d Cir. 2003) (quoting

*Richardson v. New York State Dep't of Corr. Serv.*, 180 F.3d 426, 436 (2d Cir.1999)); *see also*

*Harris v. Forklift Systems*, 510 U.S. 17 (1993).  However, "[s]imple teasing, offhand comments,

or isolated incidents of offensive conduct (unless extremely serious) will not support a claim of

---

[13] Since employment discrimination claims under Sections 1981 and 1983 are evaluated under the same
analytical framework as those brought under Title VII, *Jessamy v. City of New Rochelle*, 292 F. Supp.2d 498, 511
n.15 (citing *Whidbee*, 223 F.3d at 69 and *Sorlucco*, 888 F.2d at 7), those frameworks are cited and applied here.

discriminatory harassment." *Petrosino v. Bell Atlantic*, 385 F.3d 210, 223 (2d Cir. 2004); *see also Rizzo-Puccio v. College Auxillary Services, et. al.*, 2000 U.S. App. LEXIS 14116, at *8 (2d Cir. Jun. 14, 2000) ("As a general matter...isolated remarks or occasional episodes of harassment do not constitute a hostile work environment within the meaning of Title VII"). In fact, "[f]or racist comments, slurs, and jokes to constitute a hostile work environment, there must be a steady barrage of opprobrious racial comments." *Schwapp v. Town of Avon*, 118 F.3d 106, 110 (2d Cir. 1997).

Taking the evidence in the light most favorable to Plaintiff, he identifies four incidents to support his hostile work environment claim.[14] The first incident occurred when Calandrella met Plaintiff in 1985. At that time, he allegedly said that "he did not want him," and sent him back to his office. The next incident occurred in 1989, when Plaintiff's supervisor, Cecil Smith, allegedly asked him a series of questions about the scars on his face in an allegedly rude and offensive manner. The third incident occurred in 1994, when Calandrella allegedly told another employee that he did not want to see Plaintiff and did not want him to come to meetings. The last incident, and the only incident that occurred with the statute of limitations, happened in 2000 or 2001, when Calandrella allegedly stated that "we can do whatever we want, that is why we have lawyers at 130 Livingston." Since the third incident is supported only by hearsay, Plaintiff has not argued that a hearsay exception applies, and none are applicable, this statement is not

---

[14] Three of these incidents occurred outside of the statute of limitations, which would have expired on July 2, 1998 for his Section 1981 claims and Section July 2, 1999 for his 1983 claims. *See Nicholls v. Brookdale Univ. Hosp. & Med. Ctr.*, 2005 U.S. Dist. LEXIS 12582 (E.D.N.Y. June 22, 2005) (Weinstein, J.) (citing *Jones v. R.R. Donnelley & Sons Co.*, 541 U.S. 369, 372 (2004)) (1981); *Patterson*, 375 F.3d at 224 (1983). However, this Court will consider all of them as part of Plaintiff's hostile work environment claim because that claim "is comprised of a series of separate acts that collectively constitute one 'unlawful employment practice.'" *AMTRAK v. Morgan*, 536 U.S. 101, 117 (2002) (quoting 42 U.S.C. § 2000e-5(e)(1)).

considered on this motion. *See Phipps v. Comprehensive Cmty. Dev. Corp.*, 2005 U.S. Dist. LEXIS 1672, at *37-38 (S.D.N.Y. Feb. 2, 2005) (excluding derogatory statements made about the plaintiff to persons other than the plaintiff as hearsay on a summary judgment motion).

With respect to the first and fourth incidents, they involved facially-neutral comments and do not support Plaintiff's claim of hostile work environment. Since the comments do not reference Plaintiff's race or national origin and Plaintiff provides no evidence that would demonstrate that the comments were made in reference to him due to his race or national origin, no rational trier of fact could conclude that these comments were sufficiently severe to have altered the conditions of Plaintiff's working environment. *See Alfano v. Costello*, 294 F.3d 365, 378 (2d Cir. 2002) ("Facially neutral incidents may be included, of course, among the 'totality of the circumstances' that courts consider in any hostile work environment claim, so long as a reasonable fact-finder could conclude that they were, in fact, based on [protected category]."); *Manessis v. New York City Dep't of Transp.*, 2003 U.S. Dist. LEXIS 1921, at *19 (S.D.N.Y. Feb. 10, 2003), *aff'd*, 86 Fed. Appx. 464 (2d Cir. 2004) (finding that where the plaintiff was told, *inter alia*, in the midst of a renovation he could "go any where, even the street," he failed to demonstrate discriminatory animus).

Even if the second incident identified by Plaintiff could be considered harassment based on Plaintiff's race or ethnicity, Plaintiff has failed to cite any precedent or establish that it, as an isolated incident or collectively with the other two incidents, demonstrates this incident was sufficiently severe to have altered the conditions of, or that discrimination was pervasive in, his working environment. *See Cruz*, 202 F.3d at 570 (holding that the plaintiff "must demonstrate either that a single incident was extraordinarily severe, or that a series of incidents were

23

'sufficiently continuous and concerted' to have altered the conditions of her working environment") (quoting *Perry v. Ethan Allen, Inc.*, 115 F.3d 143, 149 (2d Cir. 1997)); *Brennan v. Metropolitan Opera Association, Inc.*, 192 F.3d 310, 318 (2d Cir. 1999) ("Isolated, minor acts or occasional episodes do not warrant relief [on motion for summary judgment on a hostile work environment claim]." ).  Moreover, "it is well settled that incidents showing that a supervisor disliked an employee and was rude or unfair to him do not, without more, prove a claim of hostile work environment."  *Thomas*, 2004 U.S. Dist. LEXIS 17694, at *50 (citing *Manessis,* 2003 U.S. Dist. LEXIS 1921, at *5-8).  Accordingly, Defendants' motions for summary judgment on Plaintiff's hostile work environment claim is granted.

## 2.    *Failure to Promote or Train*

Where the Plaintiff asserts a failure to promote claim under Sections 1981 and 1983, the court applies the three-part test established in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802 (1973).  *See Patterson*, 375 F.3d at 225.  First, plaintiff must demonstrate a prima facie case of discrimination by a preponderance of the evidence by proving "(1) that he belongs to a protected class, (2) that he was qualified for the position, (3) that he was denied the position, and (4) that the denial occurred in circumstances giving rise to an inference of discrimination on the basis of his membership in that class."  *Stern v. Trustees of Columbia Univ.*, 131 F.3d 305, 311-312 (2d Cir. 1997) (citing *Texas Dep't of Cmty. Affairs v. Burdine*, 450 U.S. 248, 253 & n.6 (1981)); *see also De La Cruz v. New York City Human Resources Admin. Dep't of Social Servs.*, 82 F.3d 16, 20 (2d Cir. 1996); *Cruz v. Coach Stores, Inc.*, 202 F.3d 560, 565 (2d Cir. 2000).  In order to meet his burden under the fourth prong of both tests, plaintiff may demonstrate that "the employer subjected him to disparate treatment, that is, treated him less favorably than a similarly

situated employee outside his protected group." *Graham v. Long Island R.R.*, 230 F.3d 34, 39 (2d Cir. 2000).

Second, "if the plaintiff establishes a prima facie case, a rebuttable presumption of discrimination arises and the burden then shifts to the defendant to articulate a legitimate, non-discriminatory reason for the employment decision." *Stratton v. Department for the Aging*, 132 F.3d 869, 879 (2d Cir. 1997). If the defendant meets his burden, "the presumption of discrimination is rebutted and it 'simply drops out of the picture.'" *Id.* (quoting *St. Mary's Honor Center v. Hicks*, 509 U.S. 502, 510-11 (1993)).

In the third and final step, the burden shifts back to the plaintiff to prove that the employer's explanation for the employment decision is merely pretextual. *See Tex. Dep't of Cmty. Affairs*, 450 U.S. at 253. Demonstrating that the employer's proffered reason is unpersuasive, contrived, or false does not, in and of itself, prove that the reason was a pretext for discrimination. *See Reeves v. Sanderson Plumbing Products, Inc.*, 530 U.S. 133, 146-47 (2000). In addition, "[p]roof that the defendant's explanation is unworthy of credence is simply one form of circumstantial evidence that is probative of intentional discrimination, and it may be quite persuasive." *Id.* at 147 (citing *St. Mary's Honor Center*, 509 U.S. at 517). Thus, the plaintiff's burden at this stage is to prove that "the evidence, taken as a whole, is sufficient to support a reasonable inference that prohibited discrimination occurred." *James v. New York Racing Assoc.*, 233 F.3d 149, 156 (2d Cir. 2000); *see also Schnabel v. Abramson*, 232 F.3d 83, 90 (2d Cir. 2000) (holding that a court should examine the entire record to determine whether the plaintiff could satisfy his "ultimate burden of persuading the trier of fact that the defendant intentionally discriminated against the plaintiff") (quoting *Reeves*, 530 U.S. at 143). To

determine the sufficiency of the plaintiff's evidence, the court should consider "'the strength of the plaintiff's prima facie case, the probative value of the proof that the employer's explanation is false, and any other evidence that supports [or undermines] the employer's case.'" *James*, 233 F.3d at 156 (quoting *Reeves*, 530 U.S. at 148-49).

In addition, on a summary judgment motion, Plaintiff must "come forward with at least some credible evidence that the actions of [Defendants] were motivated by racial animus or ill-will." *See Grillo v. N.Y. City Transit Auth.*, 291 F.3d 231, 234 (2d Cir. 2002). Specifically,

> When a plaintiff seeks to prevent summary judgment on the strength of a discrepancy in qualifications ignored by an employer, that discrepancy must bear the entire burden of allowing a reasonable trier of fact to not only conclude the employer's explanation was pretextual, but that the pretext served to mask unlawful discrimination. In effect, the plaintiff's credentials would have to be so superior to the credentials of the person selected for the job that no reasonable person, in the exercise of impartial judgment, could have chosen the candidate selected over the plaintiff for the job in question.

*Byrnie*, 243 F.3d at 103 (internal quotation marks and citation omitted). Thus, the law in this circuit permits employers to value experience over education when making hiring decisions so long as there is nothing to show that that value judgment is pretextual. *See Scaria v. Rubin*, 117 F.3d 652, 654 (2d. Cir. 1997). As the court in *Rosen v. Columbia University*, 1995 U.S. Dist. LEXIS 11111, at *20 (S.D.N.Y. Aug. 3, 1995), stated: "Under the law...it is the perception of the decisionmaker, and not that of plaintiff, which is relevant. Simply because plaintiff's perceptions of his own qualifications differ from those of his employer does not entitle us to delve into the question of which portrayal is the correct one [because this Court] does not sit as a

super-personnel department that reexamines an entity's business decisions." (internal quotation marks and citations omitted)

The parties focus their dispute on the General Superintendent position. Defendants claim that Plaintiff was not qualified for the position. Plaintiff argues that the job vacancy notice was intentionally written to exclude him from consideration. Defendants' claim, however, is supported by the evidence. The experience and education requirements listed on the job vacancy notice include "knowledge of track maintenance, track construction, and wayside maintenance operations, project management, and maintenance management techniques," and state that they are "required." (Ellman Dec., Ex. 28.) Despite the fact that Plaintiff claims that operational experience is not needed to detect track defects in the field or monitor repairs and maintenance, he does not allege that he in fact has this experience. In fact, he admits in his EEO complaint dated October 30, 2001, that he was not qualified for the job because it was an operating manager position. (Ellman Reply Dec., Ex. 41.) Consequently, he has failed to establish his prima facie case of discrimination. *See Cruz*, 202 F.3d at 566 (finding no prima facie case of discrimination where, *inter alia*, the court found that plaintiff did not allege or prove that she was qualified for the position she claimed she was denied).

Even if Plaintiff had established his prima facie case, Defendants have articulated a legitimate nondiscriminatory reason why Plaintiff was not selected to interview for the General Superintendent position and the reason why Rumph was hired. They allege that those selected to interview had operating experience, and that of those Rumph was most qualified. The burden then shifts back to Plaintiff to demonstrate that this reason was prextextual. He argues that that there was no need to require operational experience for the General Superintendent position

because: (1) the goal of the reorganization was to implement a new computer system; and (2) those hired for other "high-ranking" positions in the department of Track, e.g., Caizzo and Iovino, lacked this type of experience.  (Pl. Mem. at 15-17.)

Plaintiff's first argument is not supported by the evidence quoted and cited in Plaintiff's brief.  Specifically, Plaintiff quotes Calandrella stating that "[w]e oversee the computer system [and] TIS implements it."  *See id.*  He then cites a portion of the deposition transcript where Calandrella states that the General Superintendent was to "implement a new computer system plus pull together the group that was going to do inspection and analyze the MS-2s, track MS-2s, plus the analytical people to do a better job of the way we do inspections and gather information."  (Agostisi Dec., Ex. B at 53.)  He also cites Calandrella's deposition where Calandrella states that his department received a new computer program from TIS, and that Rumph worked with TIS staff to implement it.  (Agostisi Dec., Ex. B at 119-20.)  The evidence thus demonstrates that the General Superintendent position was created to work *with* the TIS department on the new computer system–not to lead the design of the system itself, and that operating experience was needed to understand how best to guide the design of the new program.

To prevail on his second argument, Plaintiff must demonstrate at a minimum that the NYCTA disregarded operating experience in the selection of these positions on the basis of race or ethnicity.  But Plaintiff did not identify the race or ethnicity of Caizzo and Iovino.  In any event, if the operating experience requirement did intentionally bar him from being qualified, he has not produced any evidence to suggest that Defendants' decision to do so was motivated by discrimination based on his race or ethnicity when creating the job description.  *See Foster v. Dalton*, 71 F.3d 52 (1st Cir. 1995) (affirming the judgment of the district court granting

summary judgment to the defendant, where the plaintiff was denied a position after the director of the Navy hospital directed another employee to re-write a job vacancy announcement in order to allow his friend to apply). Accordingly, since Plaintiff has failed to raise a genuine issue of material fact as to whether the use of operating experience was actually a pretext for racial discrimination or discrimination based on his ethnic characteristics, Defendants' motion for summary judgment with respect to Plaintiff's claim that the NYCTA's failure to interview him for the General Superintendent position was discriminatory is granted.

### 3. Retaliation

Plaintiff cannot assert a retaliation claim under § 1983 because "a cognizable retaliation claim under § 1983 requires that the employee was 'discharged or disciplined for the exercise of First Amendment rights.'" *Dean*, 297 F. Supp.2d at 557 (E.D.N.Y. 2004) (citing *Ezekwo v. New York Health and Hospital Corp.*, 940 F.2d 775, 780 (2d Cir. 1991)). A first amendment retaliation claim has two elements: (1) that the conduct at issue was protected speech; and (2) that the speech played a substantial part in the employer's adverse employment action." *Id.* "[P]ublic employee speech is only protected when it addresses a 'a matter of public concern.'" *Id.* (quoting *Ezekwo*, 940 F.2d at 780). Thus, personal complaints about one's employment situations, unless they implicate a system-wide discrimination issue, is not a matter of public concern. *See id.* Plaintiff did not claim he was retaliated against for the exercise of his First Amendment claim. As a result, judgment on this claim should be granted to Defendants as a matter of law.

However, "[a] retaliation claim may be brought under § 1981." *Hawkins*, 163 F.3d at 693 (citing *Chodury v. Polytechnic Institute of New York*, 735 F.2d 38, 43-44 n.6 (2d Cir. 1984))

To state cause of action under Section 1981, "the retaliation must be in response to the claimant's assertion of rights that were protected by § 1981." *Id.* Since Plaintiff's retaliation claim is based on his April 10, 2000 meeting with NYCTA officials and his 2001 EEO complaint in which he claimed he was unfairly denied a promotion, his retaliation claim is actionable under Section 1981.

To make out a prima facie case of retaliation under Title VII, a plaintiff must demonstrate "that he engaged in protected activity, that the employer was aware of this activity, that the employer took adverse action against the plaintiff, and that a causal connection exists between the protected activity and the adverse action, i.e., that a retaliatory motive played a part in the adverse employment action.' *Sumner*, 899 F.2d 203, 208-209; *see also Cifra v. General Electric*, 252 F.3d 205, 216 (2d Cir. 2001)). Once Plaintiff meets this burden, he has established a prima facie case of retaliation. The analysis then proceeds in the same manner as his failure to promote claim. Defendants "must articulate a legitimate, non-retaliatory reason for the challenged employment decision." *Treglia v. Town of Manlius*, 313 F.3d 713, 721 (2d Cir. 2002). If Defendants meet this burden, "the plaintiff must point to evidence that would be sufficient to permit a rational factfinder to conclude that the employer's explanation is merely a pretext for impermissible retaliation." *Cifra*, 252 F.3d at 216. The burden remains on Plaintiff to prove that "race...and not Defendant's offered rationale, was the true reason for the adverse employment actions." *Smith v. Ward Leonard Elec. Co.*, 2004 U.S. Dist. LEXIS 14151, at *8 (S.D.N.Y. Jul. 22, 2004) (citing *Reeves*, 530 U.S. at 143).

*Prima Facie Case*

Plaintiff claims that the reorganization of the Department of Track and his failure to be

30

selected for the positions for which he applied subsequent to his filing of complaints are retaliatory measures for his lodging of complaints alleging discriminatory conduct by NYCTA officials. Defendants summarily dismiss this argument. To make out his prima facie claim for retaliation, Plaintiff must demonstrate that "(1) [he] was engaged in an activity protected under Title VII; (2) the employer was aware of plaintiff's participation in the protected activity; (3) the employer took adverse action against plaintiff based upon [his] activity; and (4) a causal connection existed between the plaintiff's protected activity and the adverse action taken by the employer." *Cosgrove v. Sears, Roebuck & Co.*, 9 F.3d 1033, 1039 (2d Cir. 1993) (citing *Sumner v. U.S. Postal Serv.*, 899 F.2d 203, 208-9 (2d Cir. 1990)).

Plaintiff alleges that he engaged in protected activity on two occasions. The first of which occurred in April 2000 when he met with high-ranking NYCTA individuals regarding his complaints about alleged unlawful discriminatory acts. (Pl. Mem at 5.) The second occurred when he filed his EEO Complaint in October 2001. "While the law is clear that opposition to a Title VII violation need not rise to the level of a formal complaint in order to receive statutory protection, this notion of 'opposition' includes activities such as 'making complaints to management, writing critical letters to customers, protesting against discrimination by industry or by society in general, and expressing support of co-workers who have filed formal charges.'" *Cruz*, 202 F.3d at 566 (quoting *Sumner*, 899 F.2d at 209); *Butler v. Raytel Med. Corp.*, 2004 U.S. Dist. LEXIS 26023, at *5-6 (E.D.N.Y. Aug. 24, 2004) (Johnson, J.) ("In addition to protecting plaintiffs who have filed formal charges of discrimination with an administrative agency or through a lawsuit, Title VII and NYHRL protect plaintiffs who have filed informal internal complaints of discrimination with management."). Thus, both the April 2000 meeting and

Plaintiff's 2001 EEO complaint are protected activities under Title VII.

In his brief, Plaintiff does not allege or argue that Calandrella knew of Plaintiff's protected activities. Since Plaintiff has also failed to establish that the NYCTA had a policy or custom of retaliation, he can only recover if he can prove that Calandrella was personally involved in his allegedly retaliatory adverse employment actions, or was the final policymaker with respect to them. Thus, although general corporate knowledge of the protected activities is generally enough to satisfy the knowledge requirement, *Gordon v. New York City Bd. of Educ.*, 232 F.3d 111, 116 (2d Cir. 2000), here Plaintiff must prove that Calandrella had personal knowledge of these events. *See Wimmer v. Suffolk County Police Dep't*, 176 F.3d 125, 138 (2d Cir. 1999) (where plaintiff did not establish that the municipal official knew about his protected activities, the official could not be held liable in his personal capacity).

Plaintiff has failed to make this showing. Calandrella stated in his deposition that he "had no clue" whether Plaintiff filed a complaint of discrimination in 2000. (Agostisi Dec., Ex. B. at 106.) He also states that he did not know or recall when he first heard of Plaintiff's complaints, that he heard of them "after 2001," and that he knew Plaintiff had an EEO complaint. *Id.* Plaintiff has also failed to present any circumstantial evidence showing when Calandrella knew of his protected activities. Although many of the allegedly retaliatory incidents occurred in 2002, without knowing exactly when "after 2001" Calandrella knew about Plaintiff's protected activities, there can be no inference of retaliatory intent. *Cf. Woodman v. WWOR-TV, Inc.*, 411 F.3d 69, 82 (2d Cir. 2005) (discussing the knowledge requirement in the prima facie case of unlawful termination, the court held "a defendant's discriminatory intent cannot be inferred, even at the prima facie stage, from circumstances unknown to the

defendant").  Moreover, as the Second Circuit recently stated, "[i]n determining whether a genuine issue of material fact exists for trial, we are obliged 'carefully to distinguish between evidence that allows for a reasonable inference of discrimination and evidence that gives rise to mere speculation and conjecture.'" *Id.* (quoting *Bickerstaff v. Vassar Coll.*, 196 F.3d 435, 448 (2d Cir. 1999).  With the facts before the Court, it can only rely on conjecture and speculation to find that Calandrella knew about Plaintiff's protected activities before his adverse employment actions.  Consequently, Plaintiff has failed to meet his burden on his prima facie case of retaliation.[15]

*Legitimate, Non-discriminatory Reason and Pretext*

Even if Plaintiff made his prima facie case, he cannot show that Defendants' legitimate non-discriminatory reason for his adverse employment action–the failure to be selected to interview for the General Superintendent position–was pretextual.  Defendants meet their burden by stating that each person interviewed for the position had operating experience.  The burden is now on Plaintiff to demonstrate that this reason is pretextual.  As discussed *supra*, Plaintiff alleges that operating experience was not in fact required for the position because his current supervisor, Rumph's replacement, also lacks operating experience.  However, he has not alleged

---

[15] Had Plaintiff established that Calandrella knew of his protected activities, he could have easily established that he suffered an adverse employment action when he was not selected to interview for the position of General Superintendent.  *Wolf v. Bd. of Educ.*, 2000 U.S. Dist. LEXIS 257, at *7 (S.D.N.Y. 2000) ("the failure to promote or to consider an employee for promotion clearly rises to the level of adverse employment decisions").  However, Plaintiff also failed to demonstrate when he was rejected.  Thus, the Court would again have to speculate about whether there was a causal connection based on the temporal proximity between his protected activities and this adverse employment action.  Although Plaintiff also argues that his 2000 and 2001 performance reviews evidence retaliatory animus, since Plaintiff's reviews were consistent in both years, there is no causal connection based on retaliatory animus.  *See Hunter v. St. Francis Hosp.*, 281 F. Supp. 2d 534, 547 (S.D.N.Y. 2003) ("Based on the fact that Plaintiff's work evaluations...were consistent both before and after he filed his retaliation claim, this Court finds that Plaintiff has not established a causal relationship between the protected activity and his [evaluations].").  Thus, his prima facie case would still fail.

that the job description has not changed since Rumph left the position. Consequently, there is nothing in the record to support his allegation that operating experience was not in fact required when those interviewed for the position in 2002 were selected.

Regarding the General Superintendent position, the record does suggest that Plaintiff was treated differently. It is clear that the successful applicant, Rumph, was well-known by Calandrella because she and her father worked with him. (*See* Agostisi Dec., Ex. B. at 68.) Calandrella also stated that she was one of his strongest employees. *See id.* In an e-mail exchange between Rumph and Laurie Segal dated October 26, 2001, Rumph writes "[h]ere is the job description for the new General Supt. position within the planning group to start Jan.1, 2001." (Ellman Reply Dec., Ex. 48.)[16] Thus, the circumstances surrounding Rumph's hire do demonstrate that she may have received preferential treatment in the selection process. They also suggest that Plaintiff may have been eliminated from consideration before he submitted his application. However, nothing in the record could lead a reasonable jury to conclude that his race, ethnicity, or the fact that he filed an EEO complaint were the motivating factors in Calandrella's selection of Rumph. *See Krulik*, 781 F.2d at 22 (holding that prior to concluding that a public employer's decision to choose their "own person" is influenced by race, the plaintiff must show some additional evidence); *Scaria*, 1996 U.S. Dist. LEXIS 9659, at *32 (S.D.N.Y. 1996) (holding that "'favoritism' based on proven performance is surely a valid reason for promotion" and not necessarily evidence of discriminatory intent), *aff'd*, 117 F.3d 652 (2d Cir. 1997); *Foster*, 71 F.3d 52. Consequently, Plaintiff's retaliation claims fail and summary

---

[16] Since the e-mail is dated October 26, 2001 and it is undisputed that the job description was issued on December 14, 2001, the Court finds that Rumph made a typographical error, and is referring to January 1, 2002.

judgment is granted to the Defendants.

<u>CONCLUSION</u>

Defendants' motion for summary judgment is granted because Plaintiff has failed to raise a genuine issue of material fact as to whether he was discriminated against on the basis of his race or ethnicity and whether he was retaliated against for lodging a complaint alleging such discrimination. Accordingly, his federal claims are dismissed. With no federal claims before the Court, it declines to exercise supplemental jurisdiction over his pendent state and city law claims. The complaint is hereby dismissed.

**SO ORDERED.**

Dated: Brooklyn, New York
August 26, 2005

_____/s/_____
                SANDRA L. TOWNES
                UNITED STATES DISTRICT JUDGE

## Appendix A

| Position | Date Applied | Did Plaintiff Interview? | Decisionmaker | Successful Applicant (Race and/or Ethnicity, if known) |
|---|---|---|---|---|
| TIS Positions | | | | |
| Chief Telecommunications Officer | September 1999 | No | Gerald Provenzano | Paul Eliea (white) |
| Chief Officer, Strategic Planning, Integration & Engineering | September 1999 | No | Gerald Provenzano | Roy Fishelberg (white) |
| Chief, New Technology Implementation | September 1999 | Yes | Gerald Provenzano | Stephen Blakely (white) |
| Chief Financial Officer | September 1999 | Yes | Gerald Provenzano | Richard Telford (white) |
| Chief Information Officer | September 1999 | Yes | Gerald Provenzano | Robert Otero (white) |
| Department of MetroCard Operations Positions | | | | |
| Senior Director of Operations Support Information | November 2000 | No | Steven Ernst | Diedra McGill (black) |
| Senior Director of Sales Business Information Management | November 2000 | No | Steven Ernst | Joel Peskoff (white) |
| Department of Track Positions | | | | |
| General Superintendent Position | January 2002 | No | Thomas Calandrella | Terri Rumph (black) |
| Department of New Technology Implementation/TIS Positions | | | | |
| Director, Operations Coordination | March 2002 | No | Anthony Carestia | William Shrange (white) |
| Senior Director, Project Planning | March 2002 | No | Stephen Blakely | David Weiss (white) |
| Senior Project Director | March 2002 | No | Stephen Blakely | James Bailey (black) |

| Systemwide Positions | | | | |
|---|---|---|---|---|
| Senior Director, Traffic Checking Operations | November 2000 | No | Barbara Spencer | Jim Leopard (white) |
| Senior Director, Operations System Software | March 2002 | Yes | Joseph McDermott | Isaac Takyi (black) |
| Director, Maintenance Software Support | May 2002 | No | Joseph McDermott | Joseph Kocovic (white) |